UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
06-1035 JRT/FLN

| | |
|---|---|
| United States of America, | ) |
| | ) |
|        Petitioner, | ) |
| | ) |
| v. | )   **REPORT AND RECOMMENDATION** |
| | ) |
| Jeffery John Eimers, | ) |
| | ) |
|        Respondent. | ) |

On March 13, 2006, Petitioner United States of America ("the Goverment") filed a Petition to Determine Present Mental Condition of an Imprisoned Person Under 18 U.S.C. § 4245 [#1]. On April 21, 2006, a hearing was held at the Federal Medical Center at Rochester, Minnesota ("FMC-Rochester") to determine whether Respondent Jeffery John Eimers ("Respondent") is suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable psychiatric facility. Lonnie F. Bryan, Assistant United States Attorney, appeared on behalf of Petitioner; Scott Tilsen, Federal Public Defender, appeared on behalf of Respondent. Respondent was present during the hearing. At the hearing, the United States presented the testimony of Andrew Simcox, Ph.D. who was admitted as an expert without objection from Respondent[1]   Both parties submitted Post-hearing Memoranda.

---

[1] The government introduced five exhibits: Respondent's prison file which includes a Sentence Monitoring Data printout, disciplinary and work records and other administrative records, (Exh. 1); Respondent' Medical Records from July 2005 to the present (Exh. 2); the Curriculum Vitae of Andrew Simcox, Ph.D. (Exh. 3); a Patient Behavior Management Plan at FMC-Rochester for Respondent (Exh. 4); and what appear to be miscellaneous progress notes and reports on Respondent (Exh.5). Two additional exhibits are also in the record: Exhibit A (redacted) to the Government's 18 U.S.C. §4245 Petition which is a copy of the June 22, 2005 Judgment in case CR-04-40123-1 against Respondent by the United States District Court of South Dakota and Exhibit B (filed under seal) which is a copy of the February 21, 2006 Mental Health Evaluation of Respondent by the psychiatric staff at FMC-Rochester.

This matter is before the undersigned Magistrate Judge for a Report and Recommendation pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B). Based upon the following Findings of Fact and Conclusions of Law, it is recommended that the Petition to Determine Present Mental Condition of an Imprisoned Person under 18 U.S.C. § 4245 [#1] be **DENIED**.

## I. FINDINGS OF FACT

### A. SUMMARY

Respondent is a 31-year old white male who is serving a 27-month sentence for Possession of a Firearm by a Prohibited Person. He has a good conduct release date of September 8, 2006. Respondent was initially incarcerated at FPC-Yankton on July 21, 2005, but he was soon thereafter transferred to FMC-Rochester for mental health evaluation and treatment. Respondent has been at the mental health unit at FMC-Rochester since July 22, 2005. The Petition alleges that Respondent is suffering from BiPolar 1 Disorder and that he is need of treatment. The Government primarily points to symptoms of Respondent's mental disorder his conduct of Respondent in support of its Petition. The Petition also alleges that Respondent has refused care and treatment at FMC-Rochester.

### B. Respondent's Initial Mental Health Evaluations

On July 21, 2005, Respondent was seen for a psychiatric consult at FPC-Yankton. According to the MHE, he was described in the consult report as being unable to provide a logical, coherent history; his speech was goal-directed but pressured with "flight of ideas." He was described as "irritable, distractable, and unable to concentrate." *Se*e Exh. B at 2. He was described as lacking insight. *Id*. He was diagnosed at that time as BiPolar I Disorder, Manic and Polysubstance Dependence. *Id*. He was prescribed valproic acid and Zyprexa, but he refused to take

2

them. Thereafter, he was transferred to FMC for mental health evaluation and treatment. *Id*.

Upon arrival at FMC-Rochester on July 22, 2005, Respondent was seen in the Receiving and Dismals Unit for evaluation. This is how the MHE describes Respondent when he arrived at FMC-Rochester:

> ...[F]ully alert, cooperative, and exhibiting good eye contact. His speech was coherent and lucid while his mood was bright with congruent but intense effect. He denied experiencing hallucinations or suicidal or homicidal ideation.

Exh. B at 3.

After his initial evaluation Respondent was placed on the Diagnosis and Observation Unit ("the D&O unit) on the mental health unit.

During a psychiatric consultation on July 26, 2005, Respondent explained that at FPC-Yankton he refused to take the medications because he thought he was misdiagnosed because of his previous drug abuse and related behaviors. *Id*. at 3. He also stated his belief that psychotropic medications would suppress his emotions and perhaps cause lifelong side-effects. *Id*. During this second consultation, Respondent was described as exhibiting "good eye contact," self-reporting that his mood was "just fine" and "demonstrated the full range of affect." *Id.* His speech "was mildly pressured, over-elaborative and argumentative." *Id*. According to the MHE, "his thoughts were tangential, grandiose, and paranoid in content." *Id*. As an example of a grandiose thought, the MHE reports that "Respondent discussed multiple inventions he has in mind, including designs for new power generation plants, fuel-less motors and vending machines." *Id*. at 4. The MHE provides no example of Respondent' allegedly paranoid thoughts. The MHE states that Respondent denied suicidal or homicidal ideation, hallucinations, depression or insomnia. *Id*. The MHE states without

3

explanation that Respondent "did not have insight into his mental health status and initially would not sign the consent form for medications." *Id*. at 4.

The psychiatric staff at FMC-Rochester, however did persuade Respondent into taking a psychotropic medication, Olanzapine. Exh. B at 4. The next day Respondent reported that the medication made his heart race and gave him a headache, and he refused to take any further medications and accused his psychiatrist of incompetence. Because of this, the MHE describes Respondent as "paranoid." *Id*. During the hearing on April 19, 2006, Dr.Simcox acknowledged that based upon his knowledge of the effects of pyschotropic medications, it was reasonable for Respondent to report those specific side effects. Nevertheless, the next day, five days after he arrived at FMC- Rochester, Respondent was diagnosed with the following disorders: Psychosis, NOS; Rule Out Schizophrenia, Paranoid Type; Rule Out Schizoaffective Disorder, BiPolar Type; and Rule Out Bipolar Disorder. *Id.* at 4.

Dr. Andrew Simcox, a psychologist, testified that he first met Respondent in September 2005, when Respondent first arrived at FMC-Rochester. Dr. Simcox stated that the staff psychiatrist on Respondent's case had wanted to pursue an involuntary commitment at that time because Respondent had exhibited signs of mania and reactivity and was undirectable. His symptoms improved however, and in October 2005, Respondent was full of energy, and doing well at his landscaping work assignment.

 **C.** **Respondent's Current Diagnosis and Basis Thereof.**

  1. The Current Diagnosis

Dr. Simcox testified that the team of psychologists and one psychiatrist who reviewed Respondent's case, talked with him, reviewed his psychological testing and diagnosed him as

having BiPolar 1 Disorder, the most severe of mood disorders.  Dr. Simcox explained that people with BiPolar 1 Disorder exhibit episodes of mania and depression.  Dr. Simcox  explained that manic episodes are characterized by grandiose ideas, pressured speech (rapid and loud), hyperactivity, little sleep, and engaging in pleasure seeking activities.   Dr. Simcox admitted, however, that Respondent has only exhibited signs of manic episodes and has not been observed having depressive episodes.  He further characterized Respondent as having a moderate case of Bipolar 1 Disorder and admitted that Respondent's symptoms had waxed and waned during the time that he had observed him.  Dr. Simcox stated that he had ruled out drug and alcohol us (the side effects of which can sometimes mimic mania) because there was no evidence that Petitioner had used either drugs or alcohol while at FMC-Rochester.

Dr. Simcox stated that he had no basis to believe that Respondent would become homicidal, suicidal or that Respondent's condition will deteriorate. Dr. Simcox acknowledged that  bipolar disorder can sometimes improve and go into remission and  acknowledged that Respondent's symptoms had waxed and waned since during the time he had been at FMC-Rochester.  In Simcox's opinion, Respondent could not function in the normal prison population due to his disorder. Dr. Simcox based this opinion on his observation that Respondent has frequently been in lock-up at FMC-Rochester, Respondent does not have insight into his illness and Respondent is not well enough to go to a half-way house.  Dr. Simcox stated that Respondent's disinterest in talking about his symptoms and alleged illness is typical of bipolar disorder.

Regarding the treatment that Respondent would receive, Dr. Simcox's opinion was that in order for Respondent to benefit from treatments such as group therapy and activity therapy, he would first have to be medicated.  Dr. Simcox explained that it was his belief that Respondent does

not have insight into his condition and perhaps even enjoys his mania. Psychotropic medication, according to Dr. Simcox would provide Respondent with such insight. However, Dr. Simcox admitted that many people who take psychotropic medications get a benefit from them but still lack insight into their condition.

Dr. Simcox also offered his opinion whether Respondent could manage in a general prison facility. Dr. Simcox noted that he thought Respondent could not function at FPC-Yankton due to his condition. He also indicated that he believed Respondent would not receive the same level of tolerance for his behavior and his occasional irritability at a general facility as he had at the mental health unit at FMC-Rochester. Dr. Simcox predicted that if Respondent does not receive treatment he will end up staying in prison longer and he will fail to complete his supervise release

  2. <u>The Basis for Respondent' Diagnosis</u>

FMC Rochester's diagnosis of Respondent rests upon his affect, thoughts and conduct.[2]

    i. *Respondent' Affect and Thoughts*

Dr. Simcox testified that Respondent is almost always cheerful, courteous, almost always compliant with the rules and talkative with him and other members of the staff. He stated that Respondent is a good, energetic worker who does not miss work, and that Respondent is always well groomed. Dr. Simcox stated that Respondent's speech is fast but rarely loud. Dr. Simcox acknowledged that Respondent has not exhibited any violent tendencies. Regarding Respondent's refusal to take medications and opposition to being diagnosed with a mental disease, Dr. Simcox

---

[2] Psychiatric testing of Respondent resulted in a "false positive" result which is considered an invalid result. Dr. Simcox explained that this result reflects a defensive posture by the subject, i.e, that the subject does not admit to thoughts and conduct to which most mentally heathy people will admit.

said that he and Respondent had simply "agreed to disagree" and that the two enjoyed a relatively cordial relationship. Dr. Simcox also stated that Respondent is always willing to talk with mental heath unit staff.

In December of 2005, mental health officials at FMC-Rochester were considering transferring Respondent to a general prison facility. At that time, Respondent's doctors thought they were seeing a decrease in symptoms and thought Respondent could manage living in the general population. However, before Respondent was transferred to a general facility, his symptoms apparently worsened. According to Dr. Simcox, he became more difficult to direct and more argumentative. No details or examples of Respondent's behavior at this time were provided. When Respondent was put in seclusion as punishment for this behavior, his speech became more pressured and prison staff reported him making "grandiose statements" i.e., that as he was working on secret projects for the government. In all of the evaluations of Respondent, including those at FPC-Yankton and at FMC-Rochester, Respondent has never reported having hallucinations or suicidal or homicidal ideation.

ii. *Conduct Issues*

In November 2005, Respondent was found "out of bounds" because he walked out of a building while on work assignment. When reprimanded by his supervisor for leaving the building without permission. Respondent responded by telling the supervisor to "shut up." Dr. Simcox admitted during cross-examination that Respondent had given a reasonable explanation at the disciplinary hearing for being "out of bounds." Respondent explained that there were many tractor engines running in the building and the exhaust was giving him a bad headache and making him sick so he went outside for some fresh air. Dr. Simcox testified that Respondent should have asked


permission to go outside first. For the "out of bounds" violation and his retort to the supervisor, Respondent was punished by having his coveted landscaping job taken away and reassigned to the most undesirable work, i.e, food service. Respondent was further punished by having his commissary privileges taken away. Dr. Simcox agreed that Respondent's decision to leave the fume-filled building was not a reflection of a mental defect or illness.

In late January of 2006, Respondent was disciplined for refusing to do his food service work assignment on Sundays, a decision which he justified this on the basis of his Catholic religious beliefs. Dr. Simcox stated that he believed Respondent's belief that he could suddenly refuse to work on a Sunday due to his religious belief was irrational because he had previously worked on Sundays. On cross-examination, Dr. Simcox admitted that Respondent's explanation for refusing to work on Sunday was perhaps just unreasonable and a little insincere. Still, Dr. Simcox maintained that although the Bureau of Prisons gives some prisoners religious exemptions from the requirement of working on Sundays, it was somewhat irrational or unreasonable for Respondent to believe that he could suddenly say he would not work on a Sunday. According to Dr. Simcox, Respondent should have sought a religious exemption from Sunday work rather than making his own sudden decision. As with the "out of bounds" incident, the mental health staff reviewed the incident and determined that Respondent was responsible for his conduct.

Finally, Dr. Simcox described an incident in March 2005, for which Respondent was severely punished. According to a female guard, Respondent walked past her and touched the tip of her radio. When the guard tried to "redirect" Respondent, he argued with her and other guards had to be called to the scene. At the disciplinary hearing, Respondent denied touching the radio and said that another prisoner standing next to Respondent was the culprit. A report of this incident is

contained in Exh. 1. The staff psychiatrist reviewing the incident concluded that Respondent's conduct was not a manifestation of a mental defect and that he was responsible for it and therefore could be punished for it. *Id*. Dr. Simcox, however, stated that he would not have punished Respondent for this incident because he believes it was an example of "pleasure seeking" by Respondent, a behavior that is symptomatic of bipolar disorders. Dr. Simcox explained that he thinks this incident was an example of the Respondent engaging in "pleasure seeking behavior" because it was a "flirtation." For touching the guard's radio, Respondent was punished by being put in lock-up.

In sum, Respondent had three incidents of rule violations or misconduct between September 2005, and March 2006. In each instance, he was found to be competent and responsible for his conduct and punished by the mental health staff who reviewed the incident reports. He was punished each time by being put in lock-up and having his privileges taken away.

## II.  CONCLUSIONS OF LAW

### A.  Applicable Law

Under 18 U.S.C. § 4245, a prisoner who is serving time in a federal prison may not be committed to a mental hospital for care and treatment without the prisoner's consent or a court order. *See* 18 U.S.C. § 4245; *United States v. Watson*, 893 F.2d 970, 975 (8th Cir. 1990)(vacated in part on other grounds by *United States v. Holmes*, 900 F.2d 1322 (8th Cir. 1990)). If the prisoner objects to being committed, the court must order a hearing to determine if there is "reasonable cause to believe that the person may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility." 18 U.S.C. § 4245(a); *United States v. Jones*, 811 F.2d 444, 447 (8th Cir. 1987). If after a hearing, the court finds by a

preponderance of the evidence that the prisoner is suffering from a mental disease or defect for which he needs treatment in a psychiatric facility, the court will commit him to the custody of the Attorney General, who will hospitalize the person for treatment in a psychiatric section of a prison. *Watson*, 893 F.2d at 975 (citing 18 U.S.C. §4245(d)).

The U.S. Supreme Court has recognized a Constitutional liberty interest that protects the mentally ill from unwanted administration of antipsychotic drugs, *Mills v. Rogers*, 457 U.S. 291, 102 S.Ct. 2442 (1982), such liberty interest, however, is not absolute. *See Youngberg*, 457 U.S. at 319, 102, S.Ct. at 2459-60. While a criminal conviction and sentence of imprisonment extinguish an individual's right to freedom from confinement for the term of his sentence, they do not authorize the State to classify him as mentally ill and to subject him to involuntary treatment without affording him additional due process. *Vitek v. Jones*, 445 U.S. at 492, 100 S.Ct. 12 1263. The Constitution protects prison inmates from the forced administration of psychotropic drugs except when prison officials, in their exercise of their professional judgment, believe such medication is required to assure the safety of the prison staff, the inmate and his fellow inmates. *Watson*, 893 F.2d at 980. If a prisoner whose mental illness was left untreated would pose a danger to himself or others if placed in the general prison population, then treatment is needed within the meaning of 18 U.S.C. § 4245. *Horne,* at 1149. Prisoners, however, do not have a due process right to remain in isolation or segregation to avoid a particular form of treatment such as the forcible administration of psychotropic medications. *Horne*, 955 F. Supp. at 1148-49 (citing *see Watson*, 893 F.2d at 982)

Even where a court finds by a preponderance of the evidence that an inmate is suffering from a mental disease or defect and the professional judgment of prison officials is that psychotropic drugs are the appropriate treatment, an inmate is entitled to have a court determine whether the

record shows that the inmate can function adequately in the general population without the drugs. *See United States v. Watson*, 893 F.2d 970, 979 (8th Cir. 1990); *United States v. Alvarez-Lopez*, Civ. No. 9-94-440 (D. Minn. June 30, 1995). *Cf. Horne v. United States*, 955 F.Supp. 1141 (D. Minn. 1997).

Based on the records and testimony introduced at the April 19, 2006, the Court concludes that the Government has not established reasonable cause to believe that Respondent is in need of custody for care or treatment in a suitable facility as required by 18 U.S.C. § 4245(a). First, the Court is not entirely convinced that the evidence supports a finding that Respondent is suffering from the "most severe personality disorder;" and second, the Government has not established that Respondent, if left untreated, would be a danger to himself, to staff or to other inmates.

**B.    Analysis**

1.    Eimer's Symptoms Are Weak

Dr. Simcox and the other professionals at FMC-Rochester have diagnosed Respondent as having BiPolar I Disorder, a mood disorder that Dr. Simcox stated was the most severe of the mood disorders. Dr. Simcox believes that Respondent's case is a moderate one. Dr. Simcox explained that the symptoms of BiPolar I Disorder are episodes of mania and depression, grandiose ideas, pressured speech (rapid and loud), hyperactivity, engaging in pleasure seeking activity and inability to sleep. Lack of sleep is a primary symptom according to Dr. Simcox.

Respondent exhibits only some of the typical symptoms of a BiPolar I Disorder and of those which he does exhibit, his symptoms are not pronounced. Primarily, Respondent has been in one long episode of mania with no symptoms or episodes of depression. While he has revealed a few "grandiose ideas," those which Dr. Simcox related are not totally bizarre. Nor is there evidence that

Respondent is preoccupied with these thoughts or that his grandiose ideas have increased in number or in grandeur. No evidence was presented at the hearing regarding the frequency with which Respondent has discussed these ideas with anyone other than the two occasions cited by Dr. Simcox.

While Respondent has frequently been observed to have "pressured speech," his speech is only rapid, not loud and observed as such when he was in stressful situations such as lock-up, disciplinary hearings and psychiatric evaluation. And while Dr. Simcox described Respondent as having high energy and being a productive worker, he did not describe him as hyperactive or state that Respondent ever exhibited signs of hyperactivity. There was no evidence that Respondent had engaged in pleasure seeking activities. Dr. Simcox's opinion that Respondent was engaging in a "flirtation," and thus pleasure seeking when he allegedly touched the radio of a female guard is, in the court's view, pure speculation. More likely, it was just a prank. More importantly, Dr. Simcox offered no other evidence of pleasure seeking by Respondent, and he stated that there was no evidence that Respondent had sought out drugs or alcohol while at FMC-Rochester. There is some evidence in the record that Respondent sometimes does not sleep well, but Respondent' sleeping patterns were not discussed at all by Dr. Simcox and not cited in support of his diagnosis. *See* Exh. B. This is striking given that Dr. Simcox stated that inability to sleep is a primary symptom of BiPolar 1 Disorder. Dr. Simcox admitted that there have been periods when Respondent shows very little symptoms. Dr. Simcox also admitted that rather than completely lacking insight, Respondent has admitted to having a problem with anger.

Accordingly, the Court finds that the evidence showing that Respondent is suffering from a severe personality disorder is mixed. Respondent does not exhibit the primary symptom of the disease, inability to sleep; he does not suffer from depressive moods; he does not engage in pleasure

seeking activities; he has mentioned a few grandiose ideas on two occasions but they do not seem to predominate in his thoughts or conversation, he talks fast and sometimes is manic; however, there are times when he exhibits very few symptoms. Given that Respondent fails to exhibit the range of multiple symptoms usually present with the disorder, Respondent's diagnosis clearly appears to be one in which reasonable mental health professionals could disagree.

        2.        <u>Eimer's Behavior Is Controllable</u>

Respondent's most remarkable characteristic is that he is routinely cheerful and compliant. Dr. Simcox acknowledged this several times during the hearing. In response to how he and Respondent have handled their disagreement over whether Respondent should be medicated, Simcox stated, "we've agreed to disagree; he's always very friendly." Simcox stated further that Respondent always complies with what is expected of him.

Dr. Simcox related the three disciplinary incidents as evidence of mania and inability to always act rational. However, the incidents do not strike the court as such. At most, the incidents suggest that Respondent has difficulty with anger and the tightly-controlled prison regime. Dr. Simcox agreed that none of the three incidents could be described as involving "irrational" behavior. In fact, in each of the three discipline reports reviewed by the mental health unit staff he was judged to have been responsible for his behavior.

Regarding the "out of bounds" incident in November 2005, it was not irrational or unreasonable for Respondent to walk out of a fume-filled room. It was only a violation of the rules. Nor does it seem that Respondent's angry reply to his supervisor was irrational or threatening. Regarding his refusal to work on Sundays, the court finds that Respondent was not acting irrational or unreasonable, but rather, was most likely angry and/or insincere. Respondent had had a plum

work assignment taken away from him after the "out of bounds" incident and had been reassigned to the most undesirable work assignment. This situation was designed to produce resentment. Dr. Simcox also admitted that Respondent may have just been being a little insincere about his religious beliefs about working on Sunday. The court finds it much more likely that Respondent was engaging in a simple ruse to avoid a job he disliked, something which of course is a frequent occurrence, not just in prisons. Finally, the episode with touching the tip of the guard's radio seems to have been no more than a prank or an attempt to test prison rules rather than a flirtation.

Absent here is evidence that Respondent's conduct is worsening or that he is committing rule infractions more frequently. In each of the three episodes discussed above, Respondent was severely punished. Subsequent to each punishment, he did not repeat the infraction for which he was punished. Accordingly, the court finds that Respondent, while continuing to test boundaries, has demonstrated the ability to respond to punishment and reform his behavior.

   3. <u>Respondent Is Not A Danger</u>

Respondent's situation is unlike the typical case in which an inmate is involuntarily committed under §4245 because he will pose a danger to himself, staff or other inmates if left untreated. *See, e.g., Horne*, 955 F.Supp. 1141 (D. Minn. 1997). In *Horne*, the inmate was diagnosed with schizophrenia, had over twenty disciplinary incidents in three years, and was held in seclusion because of his intimidating behavior and because prison staff could not control him. *Id*. at 1148. The court granted the Government's § 4245 motion on the basis of its finding that the inmate's mental illness prevented him from being removed from segregation and placed in the general population. *Id*. at 1150. In contrast, no evidence was presented here that Respondent was put in

seclusion because he could not be controlled in the general prison population. Notably, Dr. Simcox never stated that Respondent would be a danger to himself, prison staff or the other prisoners in a general facility. Dr. Simcox only made a prediction that Respondent would not be successful in the general population because he would engage in the same types of misbehavior that resulted in being put in seclusion. No evidence was presented here that he was ever violent, intimidating or would pose a danger to prison staff or other inmates. Respondent was put in lock-up as a disciplinary measure rather than a safety one. He did not repeat the same violations of the rules after being punished. As Dr. Simcox stated, he does not believe that Respondent will become suicidal or violent.

### C. The Question of Whether Respondent May Be Forcibly Medicated With Psychotropic Medications Is Before The Court

In its Post Hearing Memorandum, the Government argues that in its view of the scope of this proceeding, "this Court determines *only* whether Respondent should be involuntarily hospitalized for psychiatric treatment. Government's Post Hearing Memorandum at 2-3. *Id*. (citing *United States v. Prestenbach*, 168 F.3d 496 (8th Cir. 1996); 28 C.F.R. §549.42) (emphasis added). According to the Government, treatment decisions, including involuntary administration of psychotropic drugs "is left for another day and another decision maker, following additional due process protections." *Id*. at 4 (citing *United States v. Horne*, 955 F.Supp. 1141, 1151 (D. Minn. 1997). The Government believes the only additional due process accorded an inmate in Respondent's position is that the treatment be based upon the recommendation of a prison mental health professional. *Id.* at 9. The Government's position, however, was expressly rejected by the 8th Circuit Court of Appeals. *See United States v. Watson*, 893 F.2d 970 (8th Cir. 1990).

In *Watson*, the Court addressed the argument made by the dissent and by the Government

here, namely, that a court should intervene only if a determination by a qualified medical personnel that administration of psychotropic medication is in the inmate's best interest is arbitrary and capricious. *Id*. at 978 n.4. In *Watson*, the Court observed that the Government was erroneously relying on precedent that held that decisions made by qualified professionals, *for purposes of imposing §1983 liability*, are presumptively valid when such decisions are challenged as violating constitutional rights. *See id.*, n. 4 (citing *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452 (1982) (emphasis added). The Court noted that even in the *Youngberg* decision, that the Supreme Court warned that the State "may not restrain [involuntarily committed] residents except when and to the extent professional judgment deems this *necessary to assure such safety or to provide needed training*." *Id*. (emphasis added). Therefore, the 8th Circuit held: "due process requires that a qualified professional determine that the forcible administration of medication is, in his or her opinion, necessary to assure everyone's safety. *Id.* (citing *Dautremont v. Broadlawns Hosp.*, 827 F.2d 291, 298 (8th Cir. 1987); *Rennie v. Klein*, 720 F.2d 266, 269 (3d Cir. 1983) (*en banc*); *United States v. Bryant* 670 F.Supp. 840, 849 (D. Minn. 1987). Clearly, in § 4245 proceedings where forcible administration of psychotropic drugs is the proposed or likely treatment for an inmate determined to have a mental disease or disorder, the decision in *Watson* directs courts to determine whether such forcible medication is needed to assure the safety of prison staff, other inmates and the inmate himself. *See, e.g., Alvarez -Lopez*, Civ. No. 9-94-440 D. Minn. June 30, 1995 (the issue of whether Mr. Alvarez-Lopez could be forcibly medicated was almost the exclusive focus of the § 4245 proceeding).

Here, the Government admits that Respondent in almost all likelihood will be prescribed antipsychotic drugs as the first step in any treatment. However, there is no basis to conclude that

16

Respondent was or ever will be harmful to others or himself and therefore does not need to be involuntarily committed for the forcible administration of psychotropic drugs. *See Holmes*, 893 F.2d at 980 ( affirming denial of §4245 petition for schizophrenic inmate because "[e]vidence on the record shows that Holmes functions adequately within the general population of the Mental Health Unit of the Medical Unit without psychotropic medications.") *Id*. at 980; *United States v. Alvarez-Lopez*,) (denying §4245 petition for a obviously psychotic inmate for whom the forced medication was sought because the inmate was not "so harmful to himself or others that he needs to be involuntarily committed"); *United States v. Zelson*, Civ. No. 3-92-765 (D. Minn. Jan. 27, 1993) (denying §4245 petition for inmate with severe obsessive compulsive behavior who would be treated with forced medication because he was not a danger to others in the prison).

This district court has recognized that if a prisoner committed under § 4245 challenges the subsequent treatment of psychotropic medications and the decision that he be medicated against his will, judicial review is appropriate when the prisoner has exhausted the applicable administrative procedures or when the Government has requested in a § 4245 that it be allowed to forcibly medicate with psychotropic drugs. *United States v. Horne*, 955 F.Supp. 1141, 1151-1152 (D. Minn. 1997). There is no doubt here that the Government would want to forcibly administer psychotropic drugs to Respondent if the § 4245 petition was granted. Thus the questions of whether the Government has requested that it be allowed to forcibly medicate Respondent or whether Respondent would be required to exhaust his administrative remedies if the petition was granted are pointless.

### III. CONCLUSION

In sum, the evidence that Respondent is suffering from a severe personality disorder, BiPolar 1 Disorder, barely satisfies the preponderance of the evidence test. It may very well be

that the weakness of Respondent's symptoms would result in a different diagnosis by a different mental health professional. More importantly, however, the Court concludes that Respondent is not potentially dangerous to himself or others to justify the deprivation of liberty interest that occurs with involuntary medication. For these reasons, it is recommended that the Petition to Determine Present Mental Condition of an Imprisoned Person Under 18 U.S.C. § 4245 [#1] be **DENIED.**

Dated: June 9, 2006  *s/ Franklin L. Noel*
FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **June 28, 2006**, a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the parties making the objections shall timely order and file a complete transcript of the hearing on or before **June 28, 2006**.