## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civil No. 06-1035 (JRT/FLN) |
| Petitioner, | |
| v. | **ORDER ADOPTING REPORT AND RECOMMENDATION** |
| JEFFREY JOHN EIMERS, | |
| Respondent. | |

Lonnie F. Bryan, Assistant United States Attorney, **OFFICE OF THE UNITED STATES ATTORNEY**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for petitioner.

Scott F. Tilsen, Assistant Federal Defender, **OFFICE OF THE FEDERAL DEFENDER**, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415, for respondent.

On March 13, 2006, petitioner United States of America filed a Petition to Determine Present Mental Condition of an Imprisoned Person Under 18 U.S.C. § 4245. The petition alleges that respondent Jeffrey John Eimers is a lawfully convicted and confined federal prisoner, who is presently suffering from a mental disease or defect, who is in need of custody for care or treatment in a suitable psychiatric facility, and who has refused transfer to the Medical Health Unit at the Federal Medical Center in Rochester, Minnesota ("FMC-Rochester") for such care or treatment.

In the Report and Recommendation dated June 9, 2006, the Magistrate Judge recommended that the petition be denied.   Petitioner objected to the Report and Recommendation on June 27, 2006.   The Court has conducted a *de novo* review of petitioner's objections to the Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and D. Minn. LR 72.2(b).   For the reasons set forth below, the Court overrules petitioner's objections and adopts the Report and Recommendation of the Magistrate Judge.

## BACKGROUND

Respondent Jeffrey John Eimers is currently serving a 27-month sentence for Possession of a Firearm by a Prohibited Person.  His scheduled good-conduct release date is October 6, 2006.  Respondent was transferred from his initial place of incarceration in Yankton, South Dakota to FMC-Rochester for mental health evaluation and treatment. He has remained there since July 22, 2005.

Respondent received a psychiatric consult in Yankton on July 21, 2005.  During this mental health evaluation, medical personnel found respondent to be incapable of providing a logical history, to have goal-directed speech pressured with "flight of ideas," to be "irritable, distractible, and unable to concentrate," and to lack insight into his condition.  *See* Exh. B at 3.  He was diagnosed at that time as having BiPolar1 Disorder. Because he refused to take the psychotropic medications he was thereafter prescribed, respondent was transferred to FMC-Rochester for mental health evaluation and treatment.

At FMC-Rochester shortly after his arrival, medical personnel conducted another mental health evaluation and described respondent as:

> [F]ully alert, cooperative, and exhibiting good eye contact.  His speech was coherent and lucid while his mood was bright with congruent but intense effect.  He denied experiencing hallucinations or suicidal or homicidal ideation.

*Id.* at 3.   Another evaluation occurred on July 26, 2005, during which respondent explained that he had refused to take the prescribed medications because he thought he was misdiagnosed and feared side effects.  The report states that he made good eye contact and self-reported his mood to be "just fine," but also that his speech was "mildly pressured, over-elaborative and argumentative." *Id.* at 4.  He shared some of his ideas for inventions, including power generation plants, fuel-less motors and vending machines, which the evaluator described as "grandiose ideas." *Id.*  The report also states that "he was not seen as exhibiting manic symptoms" though he had been described as paranoid. *Id.*

Though respondent initially refused consent to take the medication prescribed following this evaluation, the staff at FMC-Rochester eventually obtained his consent to be given the psychotropic drug, Olanzapine.  Respondent later complained that Olanzapine made his heart race and gave him a headache.

Shortly after these events, a staff psychiatrist decided to pursue involuntary commitment of respondent based on the determination that respondent had exhibited signs of mania and reactivity and could not be directed.  By December 2005, however, respondent exhibited fewer symptoms of the diagnosed condition, and mental health

officials at FMC-Rochester considered transferring him to a general prison population. Before that transfer took place, respondent reportedly became more argumentative and difficult to direct. After being placed in seclusion because of this behavior, respondent's speech reportedly became more pressured and he began making grandiose statements about working on secret government projects. On March 13, 2006, the United States filed a Petition to Determine Present Mental Condition of an Imprisoned Person Under 18 U.S.C. § 4245.

As required by federal law, the Magistrate Judge held a hearing to determine respondent's mental condition. The hearing was held on April 13, 2006 at FMC-Rochester, and respondent was represented by counsel. Dr. Andrew Simcox, who first met respondent in September 2005, made the current diagnosis based on which the United States seeks to involuntarily commit respondent. Simcox reviewed respondent's psychological testing and evaluations, and diagnosed respondent as having BiPolar1 Disorder, the most severe of mood disorders. Simcox testified at the hearing that people with BiPolar1 Disorder exhibit episodes of mania and depression. The manic episodes include expression of grandiose ideas, exhibition of pressured speech, displays of hyperactivity, instances of sleep deprivation or insomnia, and occurrences of "pleasure-seeking" activities. Simcox testified that, in his opinion, respondent could not function in the normal prison population because respondent had frequently been segregated from the general population at FMC-Rochester, he did not have insight into his illness, and he was not well enough to go to a halfway house.

In support of this diagnosis, Simcox testified about the aspects of respondent's affect, thoughts, and conduct that he believed correspond to the symptoms of BiPolar1 Disorder he had described.  Simcox testified that respondent's speech is fast but rarely loud.  He testified about respondent's expressions of grandiose ideas, his fear of psychotropic medication's side effects, and his hesitancy to discuss his symptoms as typical of BiPolar1 Disorder.  Simcox also concluded that respondent's complaint after taking Olanzapine was evidence of paranoia, but he admitted that respondent had reported common side effects of the drug.

Simcox testified about three instances of respondent's conduct for which respondent was disciplined, as evidence that respondent suffers from BiPolar1 Disorder. The first incident occurred in November 2005 when respondent was found "out of bounds" after he walked out of a building while on work assignment.  Respondent told the supervisor who found him to "shut up" when the supervisor reprimanded him. Simcox testified that respondent provided a reasonable explanation for being "out of bounds" at a disciplinary hearing held after the incident.  Respondent said he left the building to get fresh air because there were a number of tractor engines running inside, and the exhaust was making him feel sick and giving him a headache.  Simcox also testified that respondent's decision to leave a fume-filled building was not a reflection of a mental disease or defect, but said that respondent should have asked for permission before leaving the building.  Simcox testified that FMC-Rochester staff punished respondent after the disciplinary hearing by removing him from his landscaping job,

reassigning him to a less desirable position in food service, and taking away respondent's commissary privileges.

In late January 2006, FMC-Rochester staff again punished respondent for a conduct incident when he refused to perform his food service job on Sundays. Respondent claimed to be exempt from working on Sunday because of his Catholic religious beliefs. Simcox testified that respondent's belief was irrational because he had previously worked on Sundays and had never before claimed a religious exemption. Simcox also testified on cross-examination that respondent's explanation for refusing to work on Sunday was perhaps merely unreasonable and somewhat insincere. Simcox noted that respondent should have sought a religious exemption from Sunday work rather than making the decision on his own. The mental health staff at FMC-Rochester again determined that respondent was responsible for his conduct.

The third incident about which Simcox testified occurred in March 2006. Respondent allegedly touched the tip of a female guard's radio when he walked past her. The guard attempted to redirect respondent and he began arguing with her. Respondent denied touching the radio and blamed the incident on another prisoner. The staff psychiatrist determined that respondent's conduct was not a manifestation of a mental defect and that he was responsible for his conduct, and that he could therefore be punished for it. Simcox disagreed with this determination, concluding instead that the incident was an example of respondent engaging in "pleasure seeking" activities, characteristic of BiPolar1 Disorder. He considered the touching of the radio to be a flirtation.

Simcox testified that respondent is almost always cheerful and courteous, compliant with rules, and talkative with members of the staff.  He stated that respondent had exhibited no violent tendencies.    He noted that respondent had not shown any symptoms of sleep deprivation.   He admitted that respondent had only exhibited symptoms of mania and was never observed exhibiting signs of depression.   He characterized respondent as having a moderate case of BiPolar1 Disorder.

## ANALYSIS

Under 18 U.S.C. § 4245, a prisoner who is serving time in a federal prison may not be committed to a mental hospital without the prisoner's consent or a court order. *United States v. Horne*, 955 F. Supp. 1141, 1143 (D. Minn. 1997).  Section 4245 provides that if a prisoner objects "to being transferred to a suitable facility for care or treatment," the government may file a motion with the court for a hearing on the "present mental condition of the person."  18 U.S.C. § 4245.   After the hearing, the court can order the prisoner committed to the custody of the Attorney General if the Court finds that: (1) the respondent is suffering from a mental disease or defect; (2) the respondent is in need of custody for care or treatment of that disease or defect; and (3) the destination of the transfer is a suitable facility for that custody.[1]  *See* 18 U.S.C. § 4245(d); *Horne*, 955 F. Supp. at 1144.

---

[1] The parties do not dispute that FMC-Rochester is a suitable custodial facility for care or treatment.  *See United States v. Horne*, 955 F. Supp. 1141, 1150 (D. Minn. 1997) (finding that FMC-Rochester is a suitable facility for the respondent to receive care or treatment).

The Magistrate Judge concluded that petitioner had not established reasonable cause to believe that respondent is in need of custody for care or treatment in a suitable facility as required by 18 U.S.C. § 4245(a).   The Magistrate Judge found that the evidence relied upon by petitioner to show that respondent is suffering from a personality disorder is weak, and that respondent's diagnosis is one on which reasonable mental health professionals could disagree.   The Magistrate Judge also concluded that petitioner had not established that respondent, if left untreated, would be a danger to himself, staff, or other inmates.   Petitioner objects to the Report and Recommendation, arguing that the Magistrate Judge wrongly supplanted judicial judgment for the expertise of medical and prison professionals and that 18 U.S.C. § 4245 does not require proof of dangerousness.

The Court agrees with the Magistrate Judge that the evidence presented by petitioner is weak.   Petitioner argues that because Simcox testified that respondent is suffering from a mental disease and respondent did not present conflicting expert testimony, the Court must find that respondent is suffering from a mental disease.   On the contrary, "a fact finder may give properly admitted expert testimony such weight as he or she thinks the circumstances dictate that it deserves."   *Skar v. City of Lincoln, Nebraska*, 599 F.2d 253, 259 (8th Cir. 1979).   The Court has weighed Simcox's testimony that respondent exhibited some symptoms of BiPolar1 Disorder against the lack of evidence that respondent exhibited several other key symptoms associated with that condition and finds that the evidence presented is insufficient to satisfy the preponderance standard.

The most important weakness in petitioner's evidence is the complete absence of evidence that respondent ever experienced a depressive episode.   Simcox had earlier

testified that individuals with BiPolar1 Disorder exhibit episodes of both mania and depression.

As for evidence of manic episodes, respondent exhibits only some of the typical symptoms, and of those that he does exhibit, his symptoms are not pronounced.  Simcox explained that manic episodes are characterized by grandiose ideas, pressured speech (fast and loud), hyperactivity, little sleep, and engaging in pleasure-seeking activities.  To begin, Simcox testified that respondent's speech was on occasion fast, but he did not testify that respondent's speech was loud.  Moreover, the instances of "pressured speech" occurred while respondent was in stressful situations such as lock-up, disciplinary hearings, and psychiatric evaluations.  Simcox did not describe respondent as hyperactive or testify that respondent ever showed signs of being so.  Simcox also explained that inability to sleep is a primary symptom of BiPolar I Disorder.  While there is some evidence in the record that respondent had difficulty sleeping, Simcox neither discussed respondent's sleep patterns nor connected any of respondent's sleeping practices to his diagnosis.

As for evidence of "pleasure seeking," Simcox pointed only to the incident in which respondent touched the tip of a female guard's radio, which Simcox characterized as a flirtation.  The Court finds this evidence unpersuasive given the lack of any other instance of "pleasure seeking."  Notably, Simcox testified that there was no indication that respondent engaged or attempted to engage in the use of drugs or alcohol while at FMC-Rochester.

Simcox's testimony regarding the significance of two other behavioral incidents is also unconvincing. First, respondent provided a perfectly reasonable explanation for why he was found "out of bounds" during his landscaping work assignment. Simcox admitted that a decision to leave a building filled with fumes from the exhaust of running tractor engines was not an indication of a mental disease or defect. Simcox gave no explanation as to how respondent telling his supervisor to "shut up" leads to the conclusion that he suffers from the most severe of mood disorders. The outburst toward his supervisor could easily have been the result of irritation at being reprimanded or stress caused by the discomfort that initially caused him to step out of the building. Second, Simcox testified that he believed respondent's sudden claim that he could not work Sundays because of Catholic religious beliefs was irrational, but later admitted that it could have been simply unreasonable and insincere. Because respondent's punishment for the "out of bounds" incident was placement in a less desirable food service job, it does not seem irrational that he would attempt to avoid the work, even if that meant fabricating a justification for refusing to perform his assigned duties.

Because the Court finds that the government has not proved by a preponderance of the evidence that respondent is suffering from a mental disease or defect, it need not address whether petitioner has proven that respondent is "in need of custody for care or treatment." 18 U.S.C. § 4245(d). The Court nevertheless notes that it agrees with the finding of the Magistrate Judge that respondent has demonstrated the ability to respond to

punishment and reform his behavior, and that respondent is not a danger to himself or others.[2]

Accordingly, the Court denies the petition and declines to commit respondent to the custody of the Attorney General.

## ORDER

Based on the foregoing records, files, and proceedings herein, the Court **OVERRULES** petitioner's objections [Docket No. 19] and **ADOPTS** the Magistrate Judge's Report and Recommendation [Docket No. 18]. **IT IS HEREBY ORDERED** that the United States of America's Petition to Determine Present Mental Condition of an Imprisoned Person Under 18 U.S.C. § 4245 [Docket No. 1] is **DENIED**.

DATED:    August 16, 2006                    _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                              United States District Judge

---

[2] The United States further objected to what it viewed as the Magistrate Judge's improper "muddling" of the decision to be made after a hearing under 18 U.S.C. § 4245(d) and the question of whether the government can forcibly medicate a federal prisoner. Even where treatment after involuntary commitment under section 4245 "will almost certainly involve the administration of psychotropic medications," the "determination of whether the [United States] may forcibly administer psychotropic drugs should be made only following the inmate's commitment." *Horne*, 955 F.2d at 1150-52. Because the Court holds that petitioner has failed to prove by a preponderance of the evidence that respondent is suffering from a mental disease or defect, it need not further address this objection.